**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**C. Jon HANDY, Defendant-Appellant.**

**No. 71–1924.**

United States Court of Appeals,
Ninth Circuit.

Oct. 20, 1971.

As Amended on Denial of Rehearing and Rehearing En Banc
March 22, 1972.

2. In any event it is meaningless under the circumstances of this case to assert that the taxpayer ought not be required to prove a negative, since his initial burden, which the majority concedes he must carry is, in fact, to prove a negative, i. e., that he did not own the economic interest in the production payments.

Richard G. Sherman (argued), Beverly Hills, Cal., for defendant-appellant.

Richard Rosenfield, Asst. U. S. Atty. (argued), Robert L. Meyer, U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS, Chief Judge, and WEICK * and CARTER, Circuit Judges.

WEICK, Circuit Judge:

In Counts 1 and 2 of a 5-count indictment returned by the Grand Jury, Handy, as manager of Palm Springs Panorama, Inc. ("P.S.P."), was charged with filing false and fraudulent income tax returns and wilfully attempting to evade income taxes owed by said corporation for the calendar years 1964 and 1965, in the respective amounts of approximately $350,020 and $241,030, in violation of 26 U.S.C. § 7201. In Counts 3 and 4 Handy was charged with wilfully aiding, assisting, counseling and procuring the preparation and presentation of fraudulent income tax returns for P. S.P. for said calendar years, in violation of 26 U.S.C. § 7206(2). In Count 5 he was charged with wilfully attempting to evade taxes of about $6,000 in behalf of himself and his wife, in violation of 26 U.S.C. § 7201. In a separate one-count indictment he was charged with submitting to an Internal Revenue Agent a

* Honorable Paul C. Weick, Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

false document purporting to be a Management Fee Agreement, in violation of 18 U.S.C. § 1001.

At the conclusion of a 15-day trial, Handy was found guilty by a jury on Counts 1, 2, 3 and 4 of the indictment, and acquitted on count 5. He was found guilty also on the separate indictment charging him with submitting a false document to an Internal Revenue Agent. He was sentenced under the provisions of 18 U.S.C. § 4208(c) to five years' imprisonment on each of the counts on which he was found guilty, the sentences to run concurrently. He was released on a $10,000-bail bond pending appeal.

The charges on which Handy was convicted stemmed from alleged phony deductions taken in the income tax returns of P.S.P. in the amount of $709,963, labeled "Management Services and Consultant fee" in the year 1964, and $900,000 in the year 1965 for forfeited deposit on an alleged purchase of land.

There was substantial evidence that the sum of $709,963 was not paid by P.S.P. to Handy in the year 1964, or at any other time; that the alleged written contract providing for payment of said sum was spurious; and further, that the forfeited deposit which was deducted was fictitious. The alleged fictitious loss was not entered on the corporate books until after the return had been filed.

The profits of P.S.P. for ten months in 1964 amounted to $762,000. It had made provision for federal taxes amounting to $374,000. The deduction of $709,963, if valid, would have wiped out most of the profits for that year and would have eliminated most of the income tax.

Handy had entered into a written agreement with Messrs. Kagan, Manchel and Silverman (the owners of all of the shares of stock of P.S.P.) on December 14, 1964, to purchase their shares of stock for $4,000,000. He negotiated a corporate loan for P.S.P. from Trans-america Financial Corporation, the proceeds of which were used to pay for said stock.

There was evidence that the shareholders who sold their shares to Handy refused to allow him any compensation for so-called management and consulting services. In the written contract for the purchase of said shares Handy waived any claim for such services against either P.S.P. or said shareholders.

In appellant's brief it is stated:

"During the trial witnesses for the prosecution testified that the management fee agreement and forfeited deposit documents were false whereas witnesses for the defense testified that they were true."

In our judgment, the overwhelming evidence supports the Government's contentions with respect to these two deductions. Appellant's briefs are addressed to other issues which we will consider.

I

The Insanity Defense

The principal defense of Handy was that he was insane at the time the alleged criminal acts were committed. This, of course, is not the usual defense in income tax evasion cases.

There was substantial evidence that during the period of time in question Handy was able to and did engage in extensive negotiations in important and complex business transactions. At one time he operated an income tax service in Las Vegas, Nevada. He held himself out as being as expert in income tax matters, particularly in the area of tax deductions. He set up an elaborate scheme to avoid taxes in the present case. To people with whom he dealt he did not appear to be insane.

Handy relies on the testimony of four psychiatrists and one psychologist to substantiate his claim of insanity. One of the psychiatrists who testified for the defense was court-appointed. They examined Handy in 1970, about five years after the critical dates of 1964 and

1965.[1] They testified in substance that Handy had paranoid schizophrenia; that he lacked capacity to appreciate the wrongfulness of his conduct; that he was not in control of his actions; and that he could not have criminal intent to defraud the Government.

Dr. Wilkens, who testified for Handy, admitted that where a person is acting rationally in his business areas, that fact would suggest that his disorder was minimized at that time. To the same effect was some of the testimony of Dr. Suarez. Also, Handy was able to advise one of the psychiatrists who examined him as to the Ninth Circuit's rule in insanity cases.

Dr. Deering, a court-appointed psychiatrist who testified for the Government, was of the opinion that in 1964–1966 Handy did not lack substantial capacity to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law, and that he was legally sane. He admitted that Handy had neurosis and that his case was difficult to diagnose.

In addition, the testimony of three lay persons was put in evidence by stipulation.

Handy contends that the evidence supporting his claim of insanity is overwhelming and that the District Court erred in denying his motion for judgment of acquittal. We disagree.

■ Handy's evidence was sufficient to overcome the presumption of sanity, and the burden of proof was then cast upon the Government to prove sanity beyond a reasonable doubt. Hartford v. United States, 362 F.2d 63 (9th Cir. 1966). The evidence must be considered in the light most favorable to the Government.

United States v. Nelson, 419 F.2d 1237 (9th Cir.1969); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L. Ed. 680 (1942); Wendt v. United States, 394 F.2d 627 (9th Cir.1968).

■ While the testimony of lay witnesses, standing alone, cannot rebut the testimony of Handy's psychiatrists and psychologist, Buatte v. United States, 330 F.2d 342 (9th Cir.1964), it is important evidence to be taken into account with other evidence in the case, particularly the testimony of the Government psychiatrist, Dr. Deering, which conflicted with the testimony of defendant's experts.

■■ The fact that the defense had more experts to testify than the plaintiff had, is not of controlling importance. The weight of the evidence is not determined by the number of witnesses who testify for either side, but by the quality of their testimony. The credibility of experts is to be determined by the jury, not by the court.

■ In our opinion there was substantial evidence to support the jury's verdict and we will not disturb it.

■ We find no violation of the accused's Fifth and Sixth Amendment rights in the order of the District Court appointing two psychiatrists to examine him.[2] The order provided:

"If defendant does not comply with this order he shall be precluded at trial from presenting testimony upon the issue of his alleged mental capacity by any expert by whom he has been interviewed."

This order was materially different from the order which was questioned in Wade v. United States, 426 F.2d 64, 74 (9th Cir.1970).

It would indeed be anomalous if defendant were permitted to offer psychiatric testimony to support his defense of insanity, and by refusing to submit to an examination by a court-appointed psychiatrist preclude the Government

---

1. One psychiatrist, Dr. McKeever, had previously examined Handy in 1952, while he was in the Air Force, in connection with Handy's application for a discharge. Dr. McKeever at that time thought Handy was feigning mental illness in order to obtain a discharge from service.

2. One of the court-appointed experts testified for the defendant.

from offering testimony to the contrary. The examination ordered by the Court was authorized by statute. 18 U.S.C. § 4244. The statute contains protective features barring the use of any statement made by an accused person on the issue of guilt. Indeed the Court may even have inherent power to make such an order.

The order entered here did not compel "communications" or "testimony" on the issue of guilt of the defendant. It may be likened to compelling blood tests, handwriting exemplars, "fingerprinting, photographing or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." [2a] Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). See also Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

Other Circuits have upheld such an order. United States v. Baird, 414 F.2d 700 (2d Cir.1969); United States v. Bohle, 445 F.2d 54 (7th Cir.1971); United States v. Albright, 388 F.2d 719 (4th Cir.1968); Pope v. United States, 372 F.2d 710 (8th Cir.1967).

## II

### The Allen Charge [3]

■ The case was submitted to the jury on Friday morning, September 25, 1970. The jury deliberated all day Friday, until 6:00 p.m., and was excused until the following Monday at 9:30 a.m. It deliberated all day Monday, until 5:15 p.m., when it reported to the Court that it was unable to reach a verdict.

The Court conferred with counsel for the Government and for the defendant. The Court stated what transpired at this conference, in denying the motion for a new trial:

"I think the record in this case indicated * * * the fact that before the court gave the Allen charge [defense counsel] was asked if he had any objection to the charge. He was given a copy of Mathes and Devitt to read. He was also made aware of the fact that the charge had come in for some fire in the Sullivan case. Then when he was asked, after he had an opportunity to read the instruction, if he had any objection to it, his answer was 'No objection.' "

Since neither counsel had any objection, the Court delivered the Allen charge. The jury was excused until 10:00 a.m. the following morning, when it returned its verdict.

The charge which the Court gave was taken substantially from Mathes and Devitt's Federal Jury Practice and Instructions. The charge contained the matters omitted from the instruction criticized by this Court in Sullivan v. United States, 414 F.2d 714 (9th Cir.1969), where the conviction was nevertheless affirmed on the ground that the omissions were immaterial.

The instruction has been consistently approved in the Ninth Circuit when it is in a form not more coercive than that in *Allen.* Sullivan v. United States, *supra,* and cases therein cited. United States v. Moore, 429 F.2d 1305 (9th Cir.1970).

Counsel relies on an affidavit procured from juror VanOrsdel, who stated in substance that she was coerced by the instruction into agreeing to the verdict; and she further charged that juror Malovich was mentally incompetent. If the affidavit has any truth in it, it is apparent that juror VanOrsdel ignored the instruction of the Court, the substance of which was repeated several times:

" * * * [Y]ou should not surrender your honest convictions as to the weight or effect of evidence, solely because of the opinion of other jurors,

---

**2a.** There is no claim here that the court-appointed psychiatrist who examined Handy testified as to any statement made to him by Handy relating to the issue of guilt.

**3.** The name of the charge is derived from the case of Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896), where the giving of such a charge was held not to be prejudicial error.

or for the mere purpose of returning a verdict."

■ A juror may not impeach his verdict where the facts sought to be shown essentially inhere in the verdict. Bryson v. United States, 238 F.2d 657 (9th Cir.1956); Rakes v. United States, 169 F.2d 739 (4th Cir.1948).

In *Rakes, supra,* Associate Justice Prettyman of the Court of Appeals for the District of Columbia, sitting by designation, stated:

"The same rule requires that jurors are not to be harassed in any manner because of a verdict they have rendered. If jurors are conscious that they will be subjected to interrogation or searching hostile inquiry as to what occurred in the jury room and why, they are almost inescapably influenced to some extent by that anticipated annoyance. The courts will not permit that potential influence to invade the jury room. He who makes studied inquiries of jurors as to what occurred there acts at his peril, lest he be held as acting in obstruction of the administration of justice. Much of such conversation and inquiry may be idle curiosity, and harmless, but a searching or pointed examination of jurors in behalf of a party to a trial is to be emphatically condemned. It is incumbent upon the courts to protect jurors from it." (169 F.2d at 745–746)

Wright, Federal Practice & Procedure, § 554 fn. 42.

Appellant relies on decisions from three other Circuits which apparently no longer apply the rule in *Allen.*[4]

We decline, as we did in *Sullivan,* to re-examine the rule in the present appeal.

Handy was represented in this case by capable and experienced counsel who did not object to the giving of the instruction. Rule 30 Fed.R.Crim.P. provides that no party may assign as error any portion of a charge or an omission to charge unless he objected before the jury retired.

Rule 52(b) permits us to notice plain error; but we do not regard the alleged error as plain. We think it was intelligently waived.

### III

### Misconduct of the Jury

The affidavit of juror VanOrsdel, filed more than a month after the trial, not only stated that she was coerced by the Allen charge, to return a verdict which she did not want to return, but she also undertook to detail the secret deliberations in the jury room and the conduct and statements of fellow-jurors. She further endeavored to pass upon the sanity of a fellow-juror Evelyn Malovich.

Relative to charges concerning the mental processes of the jurors, the Court ruled that evidence would not be allowed to impeach the verdict. As to any extraneous influences on the jurors, the Court did conduct two post-trial evidentiary hearings. At the first hearing five jurors were examined and cross-examined by counsel for the Government and for the defendant. At the conclusion of the hearing the Court ruled that the charges of misconduct made by juror VanOrsdel concerning her fellow-jurors had not been proven. We agree.

■ There remains for consideration only the claim of juror VanOrsdel that juror Evelyn Malovich was mentally incompetent. The Court decided to conduct an evidentiary hearing on this subject only after the Court had examined the Juror Qualification Form which juror Malovich had filled out and signed.

---

4. United States v. Thomas, (D.C.Cir. 1970), 39 U.S.L.Week 2306, reaffirmed in banc, 449 F.2d 1177 (D.C.1971); United States v. Fioravanti, 412 F.2d 407 (3d Cir. 1969); United States v. Brown, 411 F.2d 930 (7th Cir. 1969).

Juror Malovich had answered question 7 on the form as follows:

"7. Do you have any physical or mental infirmity impairing your capacity to serve as a juror

Yes (Yes or no) If so, describe it fully,

_____"

The Court furnished a copy of the form to counsel for defendant. It will be observed that although the first part of Question 7 was answered, the second part was left blank. The jury clerk obviously did not notice the response.

Juror Malovich was called to the witness stand by the Court, who conducted an extensive examination of her. When shown her answer to Question 7 on the juror questionnaire form, she testified: "Your Honor, that is a mistake."

She denied that she had any physical infirmities, or ever suffered from any mental illness; she testified that she had never been examined by any doctor for any possible mental illness. She testified that the correct answer to Question 7 was "No". She also denied statements purportedly made in the jury room, attributed to her by juror Van-Orsdel. The Court tested her recollection on a number of matters. The Court further asked her who had the burden of proof, and she replied, "The Government."

The foreman of the jury had previously testified that there was no question in his mind regarding the mental capacity of juror Malovich and that she had capacity to understand the proceedings.

The District Court ruled in part as follows:

"I am ready to make my ruling on this issue.

"My ruling is that Juror Malovich is mentally qualified to serve as a juror in this case. She certainly, in my opinion, and based on her testimony, suffers from no physical or mental infirmities. I think she certainly possesses ordinary capacity to observe, listen, understand, discuss the evidence in the case, the arguments of counsel and the court's charge.

\*    \*    \*    \*    \*    \*

"I am certainly impressed with the fact that we have a woman here who for the past 11 years or 12 years has held down a job as an electronic assembler where she is required to deal with electronic component parts and place them on printed circuits—solder. She has to look at drawings and instructions and follow them. She certainly—this would indicate—has the ability to think and to reason.
\*    \*    \*

"She appears to the court to have an average understanding of the English language. Certainly I don't remember the exact time we started with her, but certainly the court questioned her for a period of probably a half hour and she understood the court's questions and her answers were intelligent and responsive.

"She appeared to the court to be completely oriented and knew what she was doing. She indicated that at no time had she ever been treated for, or consulted with a doctor about, or suffered any mental illness. And her answer to Question 7 on Court's Exhibit A was just a mistake.

"Mrs. VanOrsdel told the court that she thought Juror Malovich had problems with her hearing, but I could detect no such problem. She testified she was able to understand the questions that the lawyers asked and the answers given by the witness. And though there were some occasions when prehaps the testimony wasn't too clear, or the question, it was cleared up later on for her.

**892**

"I might also add that, as I commented during our last hearing, I detected nothing unusual about her during voir dire or during the period of time that she sat as a juror in this case. She appeared to be attentive, alert. I can recall no time when she was late for jury duty.

"So my conclusion, as I have already stated it, is that she suffers from no mental infirmity and that she appears to this court to be a perfectly normal, ordinary juror. There is not the slightest doubt about that in my mind."

In our opinion there was substantial evidence to support these findings of fact of the District Court, and they are not clearly erroneous. We find no basis for setting aside a jury verdict merely because a juror made a mistake in answering a question on the form, which mistake went unnoticed by the jury clerk. Appellant has shown no prejudice. As found by the Court he was tried by a jury of competent persons.

Furthermore, the challenge to the selection of jurors must be made "before the voir dire examination begins. * * *" 28 U.S.C. § 1867(a), (e). No challenge was made in this case until after the verdict.

■ Appellant argues that he should have been granted permission to cross-examine juror Malovich. The Court did permit counsel to submit questions to be propounded to juror Malovich, but he did not propound all questions that were submitted as the Court thought that even some lawyers could not answer all of them.

As we previously pointed out, the Court was quite liberal in permitting examination and cross-examination of five of the jurors. It was discretionary with the Court when to call a halt and avoid further harassment of the jurors. We find no abuse of discretion.

Affirmed.