766 P.2d 59

STATE of Arizona, Appellee,

v.

William Carl MAURO, Appellant.

No. CR–84–0195–AP.

Supreme Court of Arizona,
En Banc.

Dec. 1, 1988.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel Crim. Div., Georgia B. Ellexson, Diane D. Hienton, Asst. Attys. Gen., Phoenix, for appellee.

Whalen, Baggot, Wieser, Bowers & Rubenstein by Kathleen Kelly Walsh, Phoenix, for appellant.

CORCORAN, Judge.

Appellant William Carl Mauro (defendant) was convicted after jury trial of first degree murder, in violation of A.R.S. § 13–1105, and child abuse, in violation of A.R.S. § 13–3623. The convictions arose from charges that he had brutally killed his 7–year–old son, David, on November 23, 1982. Defendant unsuccessfully raised the insanity defense, contending he had believed his son was possessed by the devil. He was sentenced to death for the murder conviction and to a consecutive 28–year term of imprisonment for the child abuse conviction. Defendant appealed from his convictions and sentences, raising many constitutional, evidentiary, and procedural issues.

This is the second time this appeal has been before this court. We initially reversed the convictions, vacated the sentences, and remanded to the trial court for further proceedings. *State v. Mauro*, 149 Ariz. 24, 716 P.2d 393 (1986). Our reversal was based on our conclusion that admission at trial of a tape-recorded conversation between defendant and his wife violated his fifth amendment privilege against self-incrimination. The United States Supreme Court subsequently reversed that decision and remanded to this court for further proceedings. *Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

On remand, we must decide the remaining issues not addressed in our prior opinion. Because the facts were described in detail in both our previous opinion and the Supreme Court opinion, we will not restate the factual background here. We have jurisdiction pursuant to Ariz.Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, –4033 and –4035.

Based on our conclusion that defendant's constitutional rights were not violated and that no prejudicial evidentiary or procedural errors occurred at trial, we uphold the convictions for first degree murder and child abuse. However, because we find that defendant's mental impairment was a substantial mitigating factor in this case, we reduce his sentence for first degree murder from death to life imprisonment.

## 1. *Defendant's Self–Incrimination Claims*

A. *Defendant's Statements to His Wife.*

■ (1) *Arizona Constitution art. 2, § 10.* This court previously held that because the tape-recorded conversation between defendant and his wife was obtained in violation of his fifth amendment privilege against self-incrimination, it was not admissible at trial. *State v. Mauro*, 149 Ariz. 24, 31, 716 P.2d 393, 400 (1986). The United States Supreme Court reversed that decision, holding that the conversation between defendant and his wife did not constitute the "functional equivalent" of custodial interrogation; therefore, the police conduct did not violate defendant's fifth amendment right. *Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

Defendant argues on remand that this court did not previously address whether the tape recording was obtained in violation of the protection afforded by the Arizona Constitution, art. 2, § 10, which provides:

No person shall be compelled in any criminal case to give evidence against himself,....

This provision is worded similarly, but not identically, to the fifth amendment of the United States Constitution, which provides:

No person ... shall be compelled in any criminal case to be witness against himself,....

Defendant cites a litany of cases for the proposition that this court has the prerogative to interpret provisions of the Arizona Constitution more expansively than the United States Supreme Court interprets the federal counterparts. This court has done so in cases involving state counterparts to the fourth amendment's protection against unreasonable search and seizure and the fifth amendment's protection against double jeopardy. *See, e.g., State v. Ault*, 150 Ariz. 459, 724 P.2d 545 (1986) (search and seizure, Ariz.Const. art. 2, § 8); *Pool v. Superior Court*, 139 Ariz. 98, 677 P.2d 261 (1984) (double jeopardy, Ariz.Const. art. 2, § 10). Thus, in deciding the state constitutional issue, this court is not bound to the analysis and conclusions in this case made by the United States Supreme Court on the federal constitutional issue. *See generally* Marcus, *State Constitutional Protection for Defendants in Criminal Prosecutions*, 20 Ariz.St.L.J. 151 (1988); Feldman & Abney, *The Double Security of Federalism: Protecting Individual Liberty Under the Arizona Constitution*, 20 Ariz.St.L.J. 115 (1988). In *Pool*, we reasoned:

We would ordinarily interpret art. 2 § 10 of the Arizona Constitution ... in conformity to the interpretation given by the United States Supreme Court to the same clause in the federal constitution.... The decisions of the United States Supreme Court are binding with regard to the interpretation of the federal constitution; interpretation of the state constitution is, of course, our province.... We acknowledge, with respect, that decisions of the United States Supreme Court have great weight in interpreting those provisions of the state constitution which correspond to the federal provisions. We acknowledge that uniformity is desirable. However, the con-

cept of federalism assumes the power, and duty, of independence in interpreting our own organic law. With all deference, therefore, we cannot and should not follow federal precedent blindly.

139 Ariz. at 108, 677 P.2d at 271.

Although the state constitution refers to giving "evidence" while the federal constitution refers to being a "witness," defendant does not argue that this difference in wording should make any difference in the scope of protection available in this case. Rather, defendant argues that this court has adopted a standard different from that used by the Supreme Court in determining when police conduct constitutes "custodial interrogation," during which a defendant is entitled to constitutional protection against self-incrimination. The Supreme Court in *Arizona v. Mauro* applied the standard set forth in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), that interrogation includes a " 'practice that the police should know is reasonably likely to evoke an incriminating response from a suspect.' " *Arizona v. Mauro*, 107 S.Ct. at 1934, quoting *Rhode Island v. Innis*, 446 U.S. at 301, 100 S.Ct. at 1690. *Innis* clarified the meaning of "custodial interrogation," which had been previously referred to as "questioning initiated by law enforcement officers" in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). The *Innis* court expanded the protections of *Miranda* to cover not only express questioning by the police, but also its "functional equivalent." 446 U.S. at 301, 100 S.Ct. at 1690.

Defendant argues that this court has used a different standard from *Innis* in applying the state constitutional protection against self-incrimination. Defendant points to our decision in *State v. Finehout*, 136 Ariz. 226, 230, 665 P.2d 570, 574 (1983), in which we said: "The focus in ascertaining whether particular police conduct amounts to interrogation, then, is not on the form of words used, but the intent of the police officers and the perceptions of the suspect." Additionally, defendant points out that in *State v. Mauro* we said, "Since the intent of the detectives is so

clear, we need not address appellant's perceptions." 149 Ariz. at 31, 716 P.2d at 400.

Neither case supports defendant's contention that the state constitutional standard is different from the federal one. In both *Finehout* and *State v. Mauro*, this court addressed both appellants' federal fifth amendment claims and state constitutional claims together, not separately. In both cases, we applied the standard from *Innis* and *Finehout* interchangeably.

The *Innis* standard requires that, for police conduct to constitute "interrogation," the police must know that their words or actions are reasonably likely to result in an incriminating response. 446 U.S. at 301, 100 S.Ct. at 1690. This standard clearly involves *two* prongs: the perceptions of the suspect *and* the intent of the police. Indeed, the Supreme Court pointed out that, although

> [t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police, ... [t]his is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.

*Innis*, 446 U.S. at 301 & n. 7, 100 S.Ct. at 1690 & n. 7. Indeed, in *Arizona v. Mauro*, the Supreme Court focused heavily on police intent. *See* 107 S.Ct. at 1935–36. We find no relevant distinction between the *Innis* and *Finehout* standards. Defendant has not convinced us to adopt a standard that would change the result in this case on the basis of separate state constitutional protections greater than those afforded under the fifth amendment.

(2) *Waiver.* Defendant alternatively argues that, even if the tape-recorded conversation is not suppressed as incriminating statements under the Arizona Constitution, it should be suppressed because no evidence was presented to show that he had made a knowing, intelligent, and voluntary waiver of his *Miranda* rights before making the incriminating statements to his wife. Defendant contends that because of his mental condition he was incapable of such a waiver.

The Supreme Court recently addressed the issue of insufficient waiver under a due process analysis. *See Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In *Connelly*, the Court reversed the Colorado Supreme Court's holding that a defendant's confession to police was involuntary because defendant's mental condition at the time precluded his ability to make a voluntary waiver of his *Miranda* rights. The Court concluded:

> Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. See *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness."

*Connelly*, 107 S.Ct. at 520.

Thus, to find that a waiver of *Miranda* rights is involuntary, a court must find an element of coercive police activity in acquiring that waiver. *See also State v. Bravo*, 158 Ariz. 364, 370, 762 P.2d 1318, 1324 (1988). Defendant asks us to find this coercive activity in the actions of police in walking into his holding place, with defendant's wife, and tape-recording their conversation in an attempt to get defendant to waive his right to silence.

In light of the decision by the Supreme Court in *Arizona v. Mauro*, we cannot agree with defendant's analysis. The Court, in its reevaluation of the facts, con-

cluded that "Mauro was not subjected to compelling influences, psychological ploys, or direct questioning. Thus, his volunteered statements cannot properly be considered the result of police interrogation." 107 S.Ct. at 1936. We fail to see how we can now find "coercive police activity" from the same actions that the Supreme Court held not to constitute the functional equivalent of custodial interrogation.

Furthermore, defendant's statements were made to his wife, not to police. The state need not obtain a "waiver" of defendant's *Miranda* rights to admit those statements defendant freely volunteered to a third party in its presence. *Cf. State v. Beaty*, 158 Ariz. 232, 241, 762 P.2d 519, 528 (1988) (statements to state psychiatrist volunteered by defendant and not elicited through police interrogation were admissible without *Miranda* warnings). In fact, the Supreme Court found that "Mauro never waived his right to have a lawyer present." *Arizona v. Mauro*, 107 S.Ct. at 1935. Defendant's statements to his wife therefore are distinguishable from the statements in *Connelly*, which were made by the defendant directly to the police. Without a finding that his wife spoke to him as an agent of the police and that the conversation constituted coercive activity, defendant cannot establish the governmental conduct that would require a voluntary waiver as a necessary predicate to admission of his statements. We therefore reject his argument that his due process rights were violated by admission of the conversation in the absence of a waiver of his *Miranda* rights.

■ B. *Defendant's Statements to Colorado Prosecutor.* Evidence concerning defendant's life history was admitted during both the prosecution and defense cases. One such event involved a charge of harassment filed in Colorado in 1979. Regarding that offense, the state presented the testimony of Michael Argall, a former prosecutor from Colorado. Mr. Argall testified about conversations he had with defendant. Defendant argues that he did not waive his *Miranda* rights before speaking with Mr. Argall; therefore, Mr. Argall's testimony about defendant's statements violated defendant's fifth amendment rights.

Mr. Argall testified about two conversations with defendant regarding the harassment charge. The first occurred when defendant went to Mr. Argall's office to discuss the incident before any charges had been filed. Before the conversation began, Mr. Argall emphasized that he was a prosecutor in a position adverse to defendant and that it would not be wise for defendant to speak with him. When defendant persisted in conversing, Mr. Argall advised defendant of his *Miranda* rights and defendant signed a waiver form.

Shortly after this first conversation, a complaint of harassment was filed against defendant. A few days later, defendant went to Mr. Argall's office and stated that he wanted to discuss the matter with him. Again, Mr. Argall pointed out his adverse position to defendant, and advised defendant not to talk to him but to get an attorney. For approximately 20 minutes, defendant attempted to explain the incident that led to the harassment charge while Mr. Argall continued to tell him that he had to get an attorney.

Mr. Argall's testimony regarding his second conversation with defendant does not violate defendant's fifth amendment rights because *Miranda* warnings were not necessary. In *Miranda*, the court set forth rules of procedure applicable to "custodial interrogation." 384 U.S. at 444, 86 S.Ct. at 1612. The court stated: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* Subsequently, the Court has held that conversations voluntarily initiated by defendants do not constitute "custodial interrogation." *See California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

The record in this case indicates that no custodial interrogation existed regarding

the conversations between defendant and Mr. Argall. Both conversations were initiated by defendant. Therefore, Mr. Argall's testimony during the trial did not violate defendant's fifth amendment right.

## 2. *Admissibility of Defendant's Statements As Evidence of Sanity*

A. *Defendant's Statements to His Wife.* In our previous decision, we addressed whether admission of the tape-recorded conversation between defendant and his wife violated defendant's due process rights. We said:

> As for presenting this evidence to the jury to formulate the basis of an opinion as to appellant's sanity, we believe the practice set forth by the United States Supreme Court is instructive. In *Wainwright v. Greenfield,* [474] U.S. [284], 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), the Court held that it is violative of the due process clause to use a defendant's post-arrest, post-Miranda warnings silence as evidence of sanity. The court interpreted silence to mean "not only muteness" but also "the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." *Id.* 106 S.Ct. at 640 n. 13. *In other words, the state cannot use the words a defendant uses to request an attorney as evidence of sanity.* However, the state may, through carefully framed questions that avoid any mention of the defendant's exercise of his constitutional rights to remain silent and to consult with counsel, present evidence that after his arrest, defendant's behavior appeared rational.

*State v. Mauro,* 149 Ariz. at 32, 716 P.2d at 401 (emphasis added). This holding was not disturbed by the Supreme Court in its reversal of our holding that the taped conversation was inadmissible as incriminating statements. Further, the Court did not address the admissibility of defendant's tape-recorded statements to his wife as evidence of his sanity.

In our prior decision, we also stated that "[p]arts of the tape-recorded conversation probably violated appellant's due process rights under the fourteenth amendment," but that because we held the entire conversation inadmissible, it was unnecessary to do a "piecemeal analysis of it." *State v. Mauro,* 149 Ariz. at 32 n. 1, 716 P.2d at 401 n. 1. On remand, defendant asks us to now decide if portions of the conversation should have been excised.

■ The state contends that we need not perform such an analysis because defendant does not specify *which* portions of the conversation are inadmissible. This contention amounts to an argument that defendant "waived" his right to exclude portions of the tape by arguing unsuccessfully that the entire tape should be excluded. This court has a duty to search the record for fundamental error, whether defendant specifies exactly where it is located or not. *See* A.R.S. § 13–4035. Under that mandate, we must examine every portion of the tape for error.

■ The state further argues that because no "silence" was involved in defendant's statements, the *Wainwright* due process analysis should not apply. We disagree. As previously discussed, *Wainwright* clearly included a defendant's post-*Miranda* warning request for counsel within the protection of the fifth amendment. 474 U.S. at 295 n. 13, 106 S.Ct. at 640–41 n. 13.

■ In the taped conversation, defendant repeatedly told his wife to "shut up." He also stated, "Don't answer questions until you get rights of attorney before you find out what's going on," and "There's a public attorney. Why don't you just be quiet." Admission of these statements is not violative of defendant's due process rights under *Wainwright,* because none of these statements indicated that defendant had asserted his own *Miranda* rights to silence and to request counsel. These statements are simply evidence that he gave rational advice to his wife after his arrest, which is admissible evidence of his sanity.

■ The remaining taped statements, that "You tried as best you could to stop it," and "You tried to stop me as best you

194

can. What are you going to do, kill me? You tried the best you can to stop me," are admissible as evidence that he committed the crime, pursuant to the Supreme Court's holding that no custodial interrogation took place when defendant made those statements.

■ B. *Defendant's Request for an Attorney at his Rule 11 Examination.* Rule 11, Arizona Rules of Criminal Procedure, provides for a court-ordered examination of a defendant's mental condition to determine whether the defendant is competent to stand trial or to investigate his mental condition at the time of the offense. The trial court ordered an examination of defendant. He now argues that allowing the state's psychiatrist to testify before the jury that defendant requested his counsel's presence during his rule 11 examination deprived him of a fair trial, because use of his request for counsel as evidence of his sanity violates his fifth and fourteenth amendment rights.

> This court stated in its prior opinion: Since we have reversed this case on other grounds, we do not need to reach the ultimate issue of whether the doctor's comment on appellant's request for counsel constituted fundamental error. However, on remand we direct the trial court to restrict the use of this evidence in accordance with the due process analysis of *Wainwright v. Greenfield.* . . . Since the trial court allowed appellant's counsel to be present, and the right to have counsel present at the evaluation is an unsettled question, it seems fundamentally unfair to later use that request as evidence of sanity. However, the jury should be allowed to be told that appellant was unwilling to fully cooperate with Dr. Cleary.

*State v. Mauro,* 149 Ariz. at 34, 716 P.2d at 403. On remand in this proceeding, defendant reurges that error was committed by admitting testimony that he requested his attorney's presence at his rule 11 examination.

At trial, Michael Cleary, M.D., testified for the state that in his opinion defendant was not insane at the time he committed the offense. He reached this conclusion after two separate interviews with defendant, each approximately 2½ hours long. At the first interview on February 23, 1983, Dr. Cleary talked with defendant alone in his cell. At the second examination on March 21, 1983, defendant's attorney was present. Dr. Cleary testified as follows about defendant's request for counsel at the second mental examination:

[DR. CLEARY:] When I arrived at the jail on the 7th of March, [1983,] I was informed that the, by the jail people, that the defendant did not want to see me or refused to see me, and he wanted to talk to his lawyer first, was my understanding, and I waited around for some time in the building and I think I went back up to the County Attorney's Office then and advised the staff there of what had happened, and one of the [defense counsel's] law partners was in the jail later, and I understand that he also spoke with the defendant, but it made no difference. The defendant would not be examined and refused to be examined on March 7th, so I returned to Phoenix without talking to him. I may have seen him in the hall, but I didn't have any conversation with him.

Q [BY CHARLES D. ADAMS, DEPUTY COUNTY ATTORNEY:] Doctor, is this particular incident a matter, or what occurred with respect to it, something which you ultimately took into consideration when you made a diagnosis with respect to this defendant?

A Well, yes, it was part of the overall contact that I had with the defendant. It's certainly a fact that couldn't be ignored. He—he had his reasons for refusing the examination. He wanted to have his attorney present during the examination, and because, I believe, his attorney wasn't there that day, he decided he wouldn't cooperate and complete the examination.

Q Well, let me take you back to February 23rd, which was your first meeting with the defendant. Who was present— that was February 23rd, 1983—who was present during that particular interview?

A Well, during that examination, just the defendant and myself. There was no other person there. He, I think I talked to him in the cell on the ground floor, and there were a couple of brief interruptions, but nobody else was there.

Q And now going to the second examination on March 21, 1983, who was present during that examination?

A Well, during the second examination, Mr. [Frederick M.] Aspey, the defendant's lawyer, was present.

On cross-examination, Dr. Cleary also responded to the following question by defense counsel:

Q [BY MR. ASPEY:] Doctor, apparently you put a great deal of weight on the fact that Mr. Mauro wanted me to be present during the second part of your interview?

A Yes.

Q Is that true?

A Yes.

Q You felt that was a big deal, didn't you?

A It is a big deal. It's the first time it's happened in 1,000 examinations.

The state argues that no due process violation could occur from admission of this testimony because there was no *sixth* amendment constitutional context to defendant's request for counsel at a rule 11 examination. However, a request for counsel after *Miranda* warnings is of *fifth* amendment constitutional dimension. *See Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Whether defendant's *sixth* amendment right to counsel had attached at the time of his request is irrelevant because admission of this testimony was potentially violative of his fifth amendment *Miranda* rights. Here, because the trial court allowed defendant's counsel to be present at his rule 11 examination, no sixth amendment violation is involved.

In *Estelle v. Smith*, the Supreme Court held that a defendant's fifth amendment *Miranda* rights to silence and counsel applied to a pretrial psychiatric examination to determine his competency to stand trial. 451 U.S. at 465, 101 S.Ct. at 1874. Al-

though defendant's statements at that examination could be admitted on the issue whether he was competent to stand trial, his statements could not be used against him at his sentencing hearing on the broader issue whether he was a "future danger" to society. 451 U.S. at 466, 101 S.Ct. at 1874.

*Estelle* did not, however, involve an insanity defense. *See* 451 U.S. at 456 n. 1, 101 S.Ct. at 1870 n. 1. The Supreme Court was careful to distinguish that fact:

Nor was the interview analogous to a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of his offense. When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case.

*Estelle*, 451 U.S. at 465, 101 S.Ct. at 1874.

We find the circumstances in this case clearly distinguishable from those in *Estelle*. First, in *Estelle*, the court-ordered psychiatric examination was conducted to make a finding of dangerousness at defendant's subsequent sentencing hearing. The Supreme Court held that use of a defendant's unwarned statement to establish his future dangerousness infringed on his fifth amendment rights. 451 U.S. at 466, 101 S.Ct. at 1874. Here, however, defendant invoked the insanity defense in an attempt to exonerate himself. At his own attorney's request, the court appointed impartial experts to investigate and report on his mental condition at the time of the offense. We have previously held that, under these circumstances, the fifth amendment protections of *Estelle* are inapplicable, because "[s]ince the appellant was examined at his own request, the exposure which was invited was a clear waiver of constitutional guarantees." *State v. Smith*, 131 Ariz. 29, 34, 638 P.2d 696, 701 (1981).

We have also previously held that admission of the state's experts' testimony that a defendant refused to cooperate by answer-

ing questions was not an impermissible comment on his right to remain silent, but was rather a permissible use by the state of evidence to rebut defendant's expert evidence of insanity. *See State v. Karstetter*, 110 Ariz. 539, 542, 521 P.2d 626, 629 (1974); *State v. Schantz*, 98 Ariz. 200, 214, 403 P.2d 521, 530 (1965). Similarly, Dr. Cleary's testimony that defendant refused to see him without counsel present at his rule 11 examination was evidence that defendant would not cooperate with the state's expert.

Additionally, a recent line of federal cases has made the distinction between the use of a defendant's conduct and the use of a defendant's words or silence as incriminating evidence. Where the substance of defendant's unwarned statements or silence during a pretrial mental examination is used as evidence against him, the testimony is based on "communicative" aspects of defendant's conduct or statements, which violates the fifth amendment privilege against self-incrimination. *See, e.g., Estelle v. Smith; Cape v. Francis*, 741 F.2d 1287 (11th Cir.1984). However, where the evidence relates to defendant's conduct or demeanor, it is "nontestimonial" and is not protected by the fifth amendment. *See, e.g., Schmerber v. California*, 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908, 916 (1966); *Jones v. Dugger*, 839 F.2d 1441, 1446 (11th Cir.1988), *petition for cert. filed* April 22, 1988; *Cunningham v. Perini*, 655 F.2d 98, 100 (6th Cir.1981). The distinction is a close one, *see Jones*, 839 F.2d at 1444, but is drawn on the basis of whether the testimony is centered on the contents and substance of defendant's response or solely on his demeanor and conduct. In *Jones*, the Eleventh Circuit upheld the admission of opinion testimony by a police officer that defendant was sane when he committed the offense. The opinion was based on the officer's observations. The officer did not testify about the substance of any of defendant's unwarned statements, and none of the observations related to the substance of defendant's version of the crime. 839 F.2d at 1444–45.

Here, unlike *Estelle*, Dr. Cleary did not base his conclusion that it was "a big deal"

for Mauro to want his attorney present at his rule 11 examination on anything that Mauro said; indeed, Dr. Cleary did not have any conversation with defendant when the incident occurred, nor did he testify about the substance of defendant's statements. Rather, it was defendant's conduct—his refusal to cooperate—that Dr. Cleary took into consideration when forming his opinion about defendant's sanity. Dr. Cleary's testimony, taken as a whole, communicated to the jury only defendant's nontestimonial conduct at the time of the second examination. This conduct is no more than the evidence *Wainwright v. Greenfield* allows to show the jury that a defendant is unwilling to fully cooperate during his examination.

Based on the foregoing, we find no violation of defendant's fifth amendment right from the admission of Dr. Cleary's statement about defendant's request for counsel at his rule 11 examination.

 C. *Defendant's Silence.* On remand from the Supreme Court's decision in *Arizona v. Mauro*, we must confront an issue not addressed in our prior decision: whether admission of evidence that defendant was silent after his arrest violated his fifth amendment rights.

At trial Detective Sergeant Byron Allen of the Flagstaff Police Department testified about his investigation of the homicide. On cross-examination, defense counsel asked Det. Allen the following questions:

Q. [BY MR. ASPEY:] When Mr. Mauro was at the Police Station, were photographs taken of him?

A Later, yes, sir.

Q I'd like to show you what's been marked as Defendant's Exhibit 117. Could you describe that exhibit?

A This is a photograph of Mr. Mauro inside Captain Latham's office....

Q *Does that accurately and fairly depict the way he appeared at that time?*

A Yes, sir.

(Emphasis added.) After the photograph was entered into evidence and passed to the jury, the prosecutor asked Det. Allen

the following questions on redirect examination:

Q [BY MICHAEL G. PROST, DEPUTY COUNTY ATTORNEY:] Could you describe Mr. Mauro's demeanor when those photographs were taken?
A He was very calm. He said absolutely nothing. He followed all of Detective Blair's instructions in having him turn left, turn right, turn around.

....

Q Did Mr. Mauro follow the instructions that Detective Blair gave him?
A Yes, sir.
Q Did he appear to have any hesitation in doing so?
A No, sir.

....

Q How would you compare the demeanor of Linda Mauro ... to the demeanor of Mr. Mauro, the defendant, when you observed him at the Police Station, as you have just described?
A In comparison, they were totally different. Linda Mauro was hysterical and upset, and Mr. Mauro was very calm.

....

Q Did you note any difference in his demeanor between the time you placed him under the arrest and the time that you observed him at the station when these various photographs were taken?
A No, sir.

....

Q Have you observed, had occasion to observe the defendant during the trial today?
A Yes, sir.
Q Could you compare his demeanor during the trial today to the way you remember his demeanor on November 23rd at the Police Station?
A I would compare his the same.

In a hearing out of the presence of the jury, defense counsel moved for mistrial on the basis of Det. Allen's comment on defendant's silence.

[BY MR. PROST:] Your Honor, we would oppose the motion. The officer was testifying to his demeanor.... There was nothing about him being asked any questions. He [defendant] was simply being asked to respond to directions. I believe ... it was in response to a question concerning his demeanor. He didn't say anything. He was calm, about as he was today. He could follow directions.

And the door was opened, I believe, when Mr. Aspey went into the matter of the photograph taken at the Police Station, and I feel that I properly went into that on redirect.... There was not one iota of testimony about him being questioned, interrogated in any way about what happened, and I would certainly hope the Court would deny the motion.

The court expressed strong concern that the prosecutor not let other witnesses comment on defendant's silence, and then concluded:

It seems to me the thrust of the testimony was whether there was any speech, really not asking about what was said, whether he was talkative or quiet as part and parcel of his entire demeanor, whether he was hysterical or whether he was calm. I think the way it came out was innocuous, but certainly is an area to be avoided.

The motion is denied.

It is well established that a prosecutor may not use a defendant's post-arrest, post-*Miranda* warnings silence as evidence of a defendant's guilt. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In *Doyle*, the prosecutor impeached the defendant's exculpatory testimony by asking why he had not explained his conduct when arrested. The Supreme Court held that such cross-examination was a violation of defendant's due process rights because of the implicit *Miranda* assurance "that silence will carry no penalty." 426 U.S. at 618, 96 S.Ct. at 2245. It is equally unfair to use a defendant's post-arrest, post-*Miranda* warnings silence as evidence of his sanity at the time of arrest. *Wainwright v. Greenfield*, 474 U.S. at 292, 106 S.Ct. at 639.

Here, however, evidence of defendant's *silence* was not used to establish either defendant's guilt or sanity. The state

points out that the testimony occurred on the state's redirect examination of Det. Allen after the defense's cross-examination had focused upon defendant's *demeanor* while speaking to the officers prior to his arrest. The subject of the prosecutor's inquiry was defendant's demeanor, not his silence. Such an inquiry is a permissible one. *See, e.g., Jones v. Dugger,* 839 F.2d 1441 (11th Cir.1988) (no fifth amendment privilege against a police officer's observations of defendant's deportment); *Cunningham v. Perini,* 655 F.2d 98 (6th Cir. 1981) (prosecutor's comments about defendant's demeanor at the counsel table did not violate the fifth amendment because they referred to defendant's conduct and demeanor rather than to his failure to testify).

Furthermore, for us to find a constitutional violation, the comment on defendant's silence must be an adverse one; "it must support an unfavorable inference against the defendant and, therefore, operate as a penalty imposed for exercising a constitutional privilege." *State v. Mata,* 125 Ariz. 233, 238, 609 P.2d 48, 53 (1980). Here, we find no such adverse inference from Det. Allen's testimony. The statement did not imply that defendant was either guilty or sane; it merely reported his demeanor after the arrest. The fact that defendant said nothing while being photographed does not, alone, support an inference that he had asserted his *Miranda* right to remain silent either as evidence that he was guilty or as evidence that he was sane. We find no constitutional violation from admission of this testimony.

### 3. *Other Evidentiary Issues*

A. *Hearsay Statements of the Victim and the Victim's Brother.* Defendant argues that the trial court committed fundamental error by allowing into evidence hearsay statements of the victim, David Mauro, and his younger brother, Michael Mauro. Defendant points to two hearsay statements of the victim: first, testimony from Daniel Mauro, David's older brother, that David said, "I'm gonna run away, and I'm gonna go to school," and second, testimony from Debbie Lepich, a neighbor, that

David said "his dad would kill him if he was caught jumping on a bed." In addition, defendant argues that the trial court committed error by allowing Greg Fedele, defendant's employer, to testify that Michael told him, "I'm hammering nails the way Daddy hammers David in the bathroom closet."

The state argues that the victim's hearsay statements were admissible under the state of mind exception of rule 803(3), Arizona Rules of Evidence, which provides in part:

> The following are not excluded by the hearsay rule ...:
>
> 3. ... A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

To be admissible, the hearsay must be relevant. *State v. Christensen,* 129 Ariz. 32, 36, 628 P.2d 580, 584 (1981). A victim's state of mind is relevant only when identity or the defense of accident, suicide or self-defense is raised. 129 Ariz. at 36, 628 P.2d at 584. Because the identity of the child abuser was an issue in this case and the statements revealed the victim's mental feeling, we hold that the victim's hearsay statements were covered by the state of mind exception in rule 803(3), and were therefore properly admitted.

Michael's hearsay statement was previously presented to the jury by a witness who was responding to defense counsel's direct examination. As such, defendant cannot claim that he was prejudiced when the statement later came in during the state's rebuttal. *See State v. Fulminante,* CR–86–0053–AP (Ariz.1988).

B. *Potential Bias of the State's Psychiatrist.* During the trial, defendant attempted to show bias by the state's psychiatrist, Dr. Cleary, by inquiring into the

state's objection to the appointment of a Dr. Nolte as the state's psychiatrist. Defendant attempted to show that the prosecution objected to Dr. Nolte's appointment in order to secure Dr. Cleary's appointment.

Although we do not know the underlying motives for the state's objection to the appointment of Dr. Nolte as the state's psychiatrist, the record shows that the objection was based on the trial court's failure to follow the procedures in rule 11.3(c), Arizona Rules of Criminal Procedure, which states:

> The moving party may include in his motion a list of 3 qualified mental health experts; the other party may include such a list in a response to the motion. One expert shall be appointed from each list. If a party fails to submit such a list, or if none of the witnesses on the list submitted are available, the court shall appoint any expert of its own choosing.

Because the court appointed Dr. Nolte before the state submitted its list of experts, the state objected and requested approval to submit the names of three mental health experts, including Dr. Cleary. From that list, the court appointed Dr. Cleary.

The court disallowed defense's inquiry into the state's objection to Dr. Nolte's appointment as the state's psychiatrist. The trial judge stated:

> It seems to me that even though that might be relevant, it would involve possibly even my having to testify as to what happened and why, so I think that I will have to exclude this under rule 403. I think it would confuse the issues and mislead the jury.

> You are going to be able to talk about other things that you can use to try to show Dr. Cleary's bias, if there is any. I think this one should be avoided.

The trial court has discretion to determine whether the probative value of evidence is outweighed by the danger of unfair prejudice or confusion of the issues; we will not disturb a trial court decision unless the court has clearly abused its discretion. *State v. Williams*, 133 Ariz. 220, 230, 650 P.2d 1202, 1212 (1982). We do not

find that the trial court abused its discretion in this instance.

■ Defendant also contends that the trial court erred in refusing to allow defendant to present surrebuttal testimony by calling former Judge David G. Derickson from Maricopa County to testify that, in his opinion, Dr. Cleary had a bias in favor of the state. The state submits that the trial court correctly ruled that Judge Derickson's testimony would have misled the jury and would have led to the danger of a "mini-trial" on a collateral issue.

The decision whether to allow or deny admission of surrebuttal testimony is within the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion. *State v. Jensen*, 153 Ariz. 171, 180, 735 P.2d 781, 790 (1987). Because the defense was able to extensively cross-examine Dr. Cleary about his alleged bias, including his opinions in prior cases, and the amount of money he had been paid by the state to testify regarding the insanity defense in this and other cases, we hold that the trial court did not abuse its discretion in refusing Judge Derickson's testimony.

■ C. *Cross–Examination of Dr. Gerstenberger.* Defendant argues that the state's cross-examination of Dean L. Gerstenberger, M.D., included state-of-mind hypotheticals that are specifically prohibited by *State v. Christensen.* Furthermore, defendant argues that the questions were not based on facts in evidence and called for speculative responses; as a result, they did not assist the jury in understanding the evidence or determining a fact in issue.

Defendant's reliance on *Christensen* is misplaced because that case did not involve an insanity defense. In cases involving an insanity defense, expert testimony concerning the defendant's state of mind at the time of the crime is proper. *State v. McMurtrey*, 136 Ariz. 93, 100, 664 P.2d 637, 644 (1983). Defendant fails to point out any specific questions asked by the prosecution that assume facts not in evidence. Our review of the cross-examination reveals that the questions asked of Dr. Ger-

stenberger all assumed facts that were supported by evidence before the court. *See International Harvester Co. v. Chiarello,* 27 Ariz.App. 411, 413–14, 555 P.2d 670, 672–73 (1976). We therefore find no error.

■ D. *Testimony Concerning the Handcuffing and Shackling of Defendant.* During the state's direct examination of Deputy Sheriff Bruce Warner, the following exchange took place:

Q What preparations did you specifically have to make with Mr. Mauro before taking him to see Judge Sedillo?

A We—Gene Combs and I, Officer Combs and I both prepared him for court, and we put leg shackles on him, they are a large set of handcuff type instruments that we put on the ankles, and we—.

After this exchange, out of the hearing of the jury, defense counsel asked for a mistrial. In response the prosecutor argued that he was not trying to elicit testimony about handcuffs and shackles, but was trying to get the witness to respond to whether defendant was able to follow directions about his footwear and clothing. Although the judge denied the motion for mistrial, he directed the prosecutor to avoid further testimony about defendant being handcuffed and shackled.

In *State v. Galioto,* 126 Ariz. 188, 192, 613 P.2d 852, 856 (App.1980), the court considered whether the defendant was denied a fair trial when (1) defendant was seen by jurors being escorted to court; (2) a juror had seen defendant in handcuffs outside the courtroom; and (3) a deputy had discussed defendant's custody in the jury's presence. The court found no error because the defendant failed to show any prejudice. 126 Ariz. at 192, 613 P.2d at 856. Likewise, we find that defendant has not shown any prejudice from the brief reference to his being handcuffed and shackled, especially because defense counsel had previously elicited testimony from another witness that defendant had been handcuffed.

■ E. *Letter from Defendant to the Trial Judge.* Defendant maintains that a letter he wrote to the trial judge asking that his attorney be relieved from the case was improperly admitted into evidence because its prejudicial nature outweighed any probative value of the letter. *See* rule 403, Arizona Rules of Evidence. The trial judge's decision whether the probativeness of offered evidence is substantially outweighed by its unfair prejudice will not be disturbed on appeal absent a showing of abuse of discretion. *State v. Williams,* 133 Ariz. at 230, 650 P.2d at 1212. We find that the letter was probative of defendant's mental condition and that defendant has not shown any prejudice stemming from the letter's admission into evidence. We find no abuse of the trial court's discretion.

■ F. *Unavailability of Frances Mauro.* Defendant argues that the trial court erred in denying his motion for a continuance so that his sister, Frances Mauro, could be served with a subpoena. Defendant's motion came during the fifth week of trial and defense counsel could not provide any assurance that Frances Mauro could be located to serve the subpoena. Defendant contends that Frances Mauro would have been a material witness on the issue of defendant's insanity and that she would have testified as to defendant's mental health problems during his early life.

The denial of a motion for continuance during a trial is a matter within the trial court's discretion, and the exercise of that discretion will not be reversed on appeal absent a showing of prejudice to the defendant. *State v. Benge,* 110 Ariz. 473, 477, 520 P.2d 843, 847 (1974). Because defendant's mental health history was thoroughly explored by Dr. Gerstenberger in his testimony, defendant has not shown prejudice based on the trial court's denial of the continuance. We find no error in denying defendant's motion for a continuance.

### 4. *Jury Issues*

■ A. *Voir Dire on Insanity.* Defendant also argues that the trial court's failure to ask his requested voir dire ques-

tions concerning insanity constituted reversible error, because the court's failure to determine if jurors had potential biases against the insanity defense seriously prejudiced defendant. The state argues that the trial court asked sufficient questions on the insanity issue and that rejection of the remaining requested instructions was within the trial court's discretion.

Before trial, defendant requested the following voir dire questions be asked on the insanity issue:

85. Have any of you, your family or close personal friends been diagnosed as suffering from neurological or mental disorders?

86. Have any of you, your family c close personal friends been treated for neurological or mental disorders?

87. Have any of you discussed the so-called "Insanity Defense"? If so, state the following:

(a) What is your opinion concerning the insanity defense?

(b) Do you believe that a person can act in an irrational or insane manner and later return to a normal condition?

(c) Do you believe that if a person was insane or irrational while he committed a criminal act that he may not be held responsible for the consequences of actions under the law?

88. If the evidence in this case established that at the time of the death of DAVID MAURO that the Defendant was temporarily insane under Arizona law, would you be willing to vote for an acquittal in this case?

89. Do you agree with the principle of law that if a person was suffering from a mental disease or defect at the time of an alleged crime and if the person as a consequence thereof did not know the nature and quality of his actions or if such person did know that the person did not know what he was doing was wrong, that the individual is not responsible for his criminal conduct?

90. Would you be willing to follow this principle of the law in determining the facts of this case?

91. Do any of you believe that the insanity defense is not a legitimate defense under Arizona law?

92. Are any of you familiar with the so-called Hinckley verdict? If so, would your knowledge of this case affect your ability to serve as a fair and impartial juror in this case?

93. Are any of you familiar with the so-called Steinberg verdict? If so, would this verdict affect your ability to serve as a fair and impartial juror in this case?

94. Have any of you studied psychiatry or psychology either formally or informally? If so, state the nature of your training.

95. Have any of you read any books which have concerned themselves with psychiatric concepts or theories? If so, state the names of these books.

96. Do any of you have any relatives or close friends who are psychiatrists or psychologists? If so, state their names.

97. Do any of you think that psychiatry is an exact science such as mathematics?

98. Do all of you agree that an opinion given by a psychiatrist is necessarily based on the psychiatrist's interpretation of what he has examined?

99. During the course of your life, have you ever come across people in the field of medicine who have had different opinions concerning the same individual?

100. Have you heard of one doctor diagnosing a case one way and another doctor diagnosing the same case a different way?

101. Have you heard of one doctor prescribing one remedy for a patient and another doctor prescribing another remedy for the same patient?

102. Would you agree that this comes about because one doctor makes a different interpretation than the other from the same set of facts that he sees?

103. You would agree, would you not, that just because one psychiatrist disagrees with another, that this dispute does not, in and of itself, render either opinion unreliable?

104. If you find that a psychiatrist's opinion is unreasonable to you based

upon your view of the evidence and your background, would you be willing to reject that psychiatrist's opinion?

105. Are you aware that there are competing schools of thought within the school of psychiatry?

106. Do each of you agree that if the evidence establishes that WILLIAM CARL MAURO was unable to distinguish right from wrong or if he did not know the nature and consequences of his acts at the time of the alleged homicide in this case, that he should be acquitted of the crime by reason of insanity?

From the above questions, the court approved only one:

Have any of you studied psychiatry or psychology either formally or informally? If so, state the nature of your training.

Additionally, during the motion hearing, the court composed its own question:

The insanity defense may be presented by the defendant in this trial. Do any of you feel that you should not be on this jury for that reason?

In rejecting the remaining proposed instructions, the court gave the following reasons:

I think counsels' idea of a few questions are demonstrated by the proposed voir dire questions that they submitted to the Court. There are over 200 questions requested [by the prosecution and defense], most of which are argumentative, most of which are sermons wrapped around a question or in various ways improper. That excites my caution.

. . . .

Counsel really, I think, wants to psychoanalyze a jury, and instead of getting a jury that's fair and impartial, they are really interested in getting jurors that are unfair and partial to their side, and I think that the system is often abused and closing arguments are given in the guise of asking questions, and it goes well beyond the purpose, which is to extract information based on which counsel can try to select a fair and impartial jury.

After the trial court selected the voir dire questions it would use, counsel was asked for any further defense motions. Although defense counsel stated his objection to the court's denial of his requested voir dire concerning the jurors' religious preference, he did not object to denial of the remaining insanity questions.

During voir dire, the trial court asked the following question on the insanity issue:

Have any of you studied psychiatry or psychology, either formally or informally?

Several prospective jurors indicated that they had taken college courses in those subjects. The court then asked:

The defense of insanity may be presented by the defendant in this trial. We find sometimes that people have strong feelings about that to the point where they really can't sit as a fair and impartial juror.

Do any of you feel that you should be excused from being on this jury because the insanity defense may be raised?

(No response indicated.)

The trial court also asked the jurors whether they had such strong beliefs about the case that they could not set them aside, and several jurors were excused on that basis. The court asked a general question about whether the jurors had ever "had any personal experience in a case like this," and whether "you or any members of your family or people that you feel especially close to ever have been involved in a case like this." No jurors responded.

In our previous decision, we noted that a trial court has discretion in determining the scope of voir dire, and that we will not find error from limitation of voir dire absent an abuse of discretion. *State v. Mauro*, 149 Ariz. at 28, 716 P.2d at 397, citing *State v. Tims*, 143 Ariz. 196, 198, 693 P.2d 333, 335 (1985). We also pointed out that some of the proposed questions were similar to a question we upheld in *State v. Chaney*, 141 Ariz. 295, 686 P.2d 1265 (1984), in which the trial court had asked:

Are any of you acquainted with anyone who has been treated for having a men-

tal disorder, a neurological disorder, or a brain disorder?

We concluded in *State v. Mauro:*

Both the defense and the prosecution submitted questions that paralleled this inquiry but they were not asked. We find the questions to be direct and relevant. However, because we dispose of the case on other grounds, we need not decide if it was an abuse of discretion for the trial court to refuse to ask them.

Although we need not decide if the court's voir dire on insanity was sufficient to avoid error, we believe that, in the future, trial courts should broaden the scope of their inquiry to extend beyond the minimum due process demands of "putting to jurors all appropriate questions requested by counsel." *See State v. Chaney,* 141 Ariz. at 303–04, 686 P.2d at 1273–74 (quoting Rule 18.5(d)).

149 Ariz. at 28, 716 P.2d at 397. We must now decide if the trial court's failure to give the requested instructions constituted reversible error.

In determining if defendant's due process rights were violated by the trial court's failure to ask his questions, we must consider whether defendant has shown a nexus between the prejudice feared and an issue in the case. *State v. Skaggs,* 120 Ariz. 467, 470, 586 P.2d 1279, 1282 (1978). Here, insanity was the major issue in the case. However, defendant has failed to show how he was prejudiced by the trial court's failure to ask the remaining questions. This is not a case where the court refused to voir dire the jury at all on the insanity issue; rather, the trial court questioned the jurors on their bias toward the insanity defense and rejected the remaining questions as argumentative.

The trial court has discretion not to ask proposed voir dire questions that are argumentative. *State v. McMurtrey,* 136 Ariz. at 98–99, 664 P.2d at 642–43. In *McMurtrey,* we said:

Even if we assume [the requested question] unambiguously raises the issue of the juror's feelings about the insanity defense, the court's refusal to ask it is not tantamount to refusal to voir dire on

the insanity defense. The trial judge refused to ask the question not because it involved the insanity defense, but because he found that in the form requested, it amounted to argument. Nowhere in the record before us does the trial judge refuse to voir dire about the insanity defense.

. . . .

Appellant's requested question ... appears to be designed to condition the jurors to the receipt of psychiatric testimony to the effect that appellant was insane at the time of the killings and therefore not legally responsible. As such, the trial court did not abuse its discretion in refusing the question on the ground that it amounted to argument.

136 Ariz. at 98, 664 P.2d at 642. Similarly, as the trial court correctly noted, many of defendant's requested instructions were designed to test the reception of his closing argument rather than to ferret out potential juror bias.

■ Defendant's only allegation of prejudice comes from the trial court's failure to ask if any of the jurors were acquainted with anyone having a mental, neurological, or brain disorder. In determining if the trial court erred in refusing to ask this question, we must first look to the entire voir dire examination to see if the purpose of the requested question was otherwise covered. *See State v. Via,* 146 Ariz. 108, 117, 704 P.2d 238, 247 (1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 577 (1986). Rule 18.5(e), Arizona Rules of Criminal Procedure, limits examination of jurors to "inquiries directed to bases for challenges for cause or to information to enable the parties to exercise intelligently their peremptory challenges." *See generally* 2 C. Smith, *Arizona Practice: Civil Trial Practice* §§ 437–40 at 383–89 (1986), for categories of questions that generally give counsel the opportunity to evaluate jurors for potential bias.

Here, the only question propounded by the court on the issue of bias effectively allowed the prospective juror to determine whether he or she should be excused. The question elicited no information—only the

juror's subjective evaluation of his or her ability to serve. We do not believe this question sufficiently addressed juror prejudice. At best, the question only minimally touched on juror bias. Had defendant requested proper questions, the trial court might have erred in refusing them and instead propounding this single, inadequate question. In the absence of proper requests from defendant, however, we do not believe that the trial court's minimal voir dire can be considered prejudicial error. We repeat, however, our words from *State v. Mauro:*

> [I]n the future, trial courts should broaden the scope of their inquiry to extend beyond the minimum due process demands of "putting to jurors all appropriate questions requested by counsel."

149 Ariz. at 28, 716 P.2d at 397, quoting *State v. Chaney*, 141 Ariz. at 303–04, 686 P.2d at 1273–74.

■■■ B. *Jury's View of the Scene.* Defendant argues that the trial court abused its discretion in rejecting defense counsel's request to have the jury view the trailer in which the homicide occurred. Defendant maintains that a view would have been particularly helpful to the jury because of testimony concerning whether the trailer door was locked during the time of the homicide, and whether sounds could be heard coming from the bathroom at the time of the homicide. Defendant claims these issues were relevant because they directly affected the credibility of the testimony of the state's two eyewitnesses, Daniel Mauro and Linda Mauro.

Whether to grant a view of the crime scene by the jury is a matter left to the trial court's sound discretion. *State v. Money*, 110 Ariz. 18, 514 P.2d 1014 (1973). In *Money*, we stated that "for a denial of a jury view to constitute an abuse of discretion, it must appear almost to a certainty that such denial deprived the jury of material assistance in evaluating the evidence and that such deprivation was in fact prejudicial to the defense." 110 Ariz. at 25, 514 P.2d at 1021. In this case, the judge was concerned that the jury could be misled by viewing the trailer because the premises might not be in the same condition as they were on November 23, 1982. The judge also felt that the jury could get the necessary evidence through diagrams, photographs, and testimony. Given these considerations, we cannot say that the judge abused his discretion by denying the motion to view the scene.

C. *Comment by Trial Court on Defense Counsel's Conduct.* During the cross-examination of Deputy Warner, the following exchange took place:

Q [BY DEFENSE COUNSEL MR. ASPEY:] Do you recall my asking you concerning his behavior on the day that he was taken from his initial appearance in front of the Judge?

A [DEPUTY WARNER:] I believe there was some discussion, yes.

Q Do you recall what your answer was?

A Without reading it, no, I don't.

Q Didn't you tell me—

MR. PROST: Your Honor, I would ask that the witness be shown the statement to see if it refreshes his recollection.

THE COURT: He doesn't have to. I am more concerned with counsel testifying. That's unethical, and if it is objected to by opposing counsel, I don't think that I should be in a position where I have to permit it.

Defense counsel withdrew the question and handed the prior statement to the witness who then read the statement during his testimony.

■■■ Defendant makes two arguments regarding the above dialogue. First, defendant claims that defense counsel should have been permitted to impeach the witness with his prior inconsistent statement that had been tape recorded by defense counsel. This argument fails because defense counsel was able to achieve his desired purpose when he had the witness read the prior statement to the court.

■■■ Second, defendant claims that for the trial judge to assert or imply to the jury that defense counsel was unethical is reversible error. Because defense counsel had not yet "testified" at the time of the

court's remarks, the court was not in the position of attacking defense counsel personally, but was speaking hypothetically to the fact that an attorney who is conducting a jury trial may not testify. When considering the entirety of the trial, the trial court's remarks were so minor that they cannot be said to have affected any substantial right or denied appellant a fair trial. *See United States v. Welch,* 745 F.2d 614 (10th Cir.1984).

D. *Jury's Application of Insanity Instruction.* Defendant argues that because the trial court declined to give defense counsel's proposed insanity instruction, the jury misunderstood the law and applied the wrong burden of proof regarding the insanity defense. As evidence of this misunderstanding, defendant submitted the affidavit of Michael Goodman, a defense investigator, stating that he was told by a juror that "the jury convicted the defendant because it did not feel the defense proved that the defendant was insane."[1]

The trial court gave the following instruction regarding the insanity defense:

The State must prove the defendant guilty beyond a reasonable doubt. The State must prove beyond a reasonable doubt the defendant was sane.

If you are not satisfied beyond a reasonable doubt that the defendant did know right from wrong and that the defendant did know the nature and results of his acts, then the State has not borne its burden of proof to show that the defendant was sane.

If you are not convinced beyond a reasonable doubt that the defendant was sane, you must find him not guilty by reason of insanity.

During jury deliberations, the jury asked the court to again define the term "insani-

ty." The court sent back the following definition:

To be legally insane means a person is not responsible for criminal conduct if at the time of such conduct the person was suffering from such a mental disease or defect as not to know the nature and quality of the act or, if such person did know, that such person did not know that what he was doing was wrong....

The judge's instructions to the jury were a correct statement of the law at the time of defendant's trial and properly apprised the jury that the state had the burden to prove that defendant was insane.[2] For that matter, the important concepts of defendant's proposed instruction were included in the instruction that was given. Therefore, the court did not err in refusing to give the requested instruction.

Defendant also claims that he is entitled to a new trial because the jury failed to follow the trial court's instructions. A motion for new trial based on juror misconduct is made pursuant to rule 24.1(c)(3), Arizona Rules of Criminal Procedure, which states:

The court may grant a new trial for any of the following reasons:

....

(3) A juror or jurors have been guilty of misconduct by:

(i) Receiving evidence not properly admitted during the trial;

(ii) Deciding the verdict by lot;

(iii) Perjuring himself or wilfully failing to respond fully to a direct question posed during the voir dire examination;

(iv) Receiving a bribe or pledging his vote in any other way;

---

1. During a conference in chambers, Mr. Prost, the deputy county attorney, told the trial judge that he had spoken with the juror in question and that "[h]e told me over the phone that the statement of the conversation or summary of the conversation that he had with Mr. Goodman was incomplete, that he had told Mr. Goodman that they [the jurors] did understand, well understood that the State bore the burden of proof, that the implication in the affidavit of Mr. Goodman is just simply incorrect."

2. We note that in *State v. Superior Court (Mauro),* 139 Ariz. 422, 678 P.2d 1386 (1984), this court determined that A.R.S. § 13–502(B), effective July 27, 1983, which places the burden of proof on the *defendant* to show by clear and convincing evidence that he is not criminally responsible by reason of insanity, did not apply retroactively to defendant's case, and that the prior statute should apply.

(v) Becoming intoxicated during the course of the deliberations; or

(vi) Conversing before the verdict with any interested party about the outcome of the case.

Rule 24.1(d) controls the admissibility of juror evidence to impeach the verdict and states:

Whenever the validity of a verdict is challenged under rule 24.1(c)(3), the court may receive the testimony or affidavit of any witness, including members of the jury, which relates to the conduct of a juror, official of the court, or third person. No testimony or affidavit shall be received which inquires into the subjective motives or mental processes which led a juror to assent or dissent from the verdict.

Rule 24.1(c)(3) lists the 6 exclusive types of juror misconduct. *See State v. Hall,* 129 Ariz. 589, 595, 633 P.2d 398, 404 (1981). Juror misunderstanding of instructions is not one of the grounds of misconduct listed in rule 24.1(c)(3). Furthermore, Mr. Goodman's affidavit is evidence which inquires into a juror's subjective motives or mental processes and is inadmissible under the explicit wording of rule 24.1(d). Information concerning how a particular juror viewed the burden of proof relates to the juror's mental processes. As a result, the trial court did not err in rejecting defendant's request for a new trial based upon juror misconduct.

■ E. *Jury Verdict.* Defendant argues that the jury verdict was contrary to the weight of the evidence because it did *not* find that defendant was insane at the time of the homicide. In this case, two expert witnesses testified about defendant's mental condition at the time of the homicide. The testimony of the experts conflicted. Dr. Gerstenberger testified that defendant was insane according to the *M'Naghten* rule and Dr. Cleary testified that defendant was sane when the crime was committed. Dr. Cleary testified as follows:

Q [BY MR. ADAMS:] Finally, Dr. Cleary, could you again state your opinion as to whether on the morning of November 23, 1982, the defendant appreciated the nature and quality of his acts and was able at that time to distinguish right from wrong?

A It's my opinion that at the actual time of the homicide, at the actual time of the killing of David Mauro, that the defendant did appreciate the nature and quality of his act and had the mental capacity to know that what he was doing was wrong.

Stated differently, he did not suffer from any mental disease or defect at the time which would have prevented him from recognizing the nature and quality of his act, or which would have prevented him from recognizing that that particular act was wrong.

The jury must resolve conflicts in psychiatric testimony. *See State v. Neal,* 143 Ariz. 93, 97, 692 P.2d 272, 276 (1984); *United States v. Segna,* 555 F.2d 226, 230 (9th Cir.1977). This court will uphold the verdict when sufficient evidence has been presented to support a theory of the case establishing the defendant's sanity beyond a reasonable doubt. *State v. Sisk,* 112 Ariz. 484, 486, 543 P.2d 1113, 1115 (1975). Although Dr. Cleary did testify that defendant suffered a compulsive personality disorder, he did not waver from his opinion that defendant was sane on the morning of November 23, 1982. When considering whether a verdict is contrary to the evidence, this court does not consider whether it would reach the same conclusion as the jury, but whether there is a complete absence of probative facts to support its conclusion. *State v. Tucker,* 113 Ariz. 475, 477, 557 P.2d 160, 162 (1976). Viewed in this light, we hold that there was some basis for Dr. Cleary's opinion and that his opinion constituted evidence sufficient to permit reasonable jurors to conclude that the defendant was legally sane beyond a reasonable doubt.

### 5. *Post–Trial Issues*

■ A. *Motion to Vacate Judgment Based on New Evidence.* After the entry of the jury verdicts but before sentencing, defendant filed a petition for post-convic-

tion relief alleging newly discovered evidence. Because defendant had not yet been sentenced, the petition was considered as a motion to vacate judgment. As provided by rule 24.2(a)(2), Arizona Rules of Criminal Procedure, a motion to vacate judgment based on newly discovered material facts is evaluated under the standard of rule 32.1(e).

The "newly discovered evidence" consisted of an affidavit dated May 16, 1984 by Mr. David Crumbaugh, a Pentecostal minister and car salesman. In the affidavit, Mr. Crumbaugh stated that he had conversations with Linda Mauro, defendant's wife, during which she told him that she disliked her son David, that David was demon-possessed, that she wanted David dead, and that she had tried to choke David. In addition, Mr. Crumbaugh stated that Linda Mauro had testified falsely and that she had told him that she knew she was going to prison. During the hearing to vacate judgment, Mr. Crumbaugh asserted his ministerial privilege and refused to testify about his affidavit. The trial judge ruled that with respect to Linda Mauro, the ministerial privilege had been waived, and ordered Mr. Crumbaugh to answer questions about his affidavit. When he refused, Mr. Crumbaugh was held in contempt of court. Although he refused to answer any questions about the affidavit, he did admit that his statement in the affidavit concerning Linda Mauro's false testimony was not based on firsthand knowledge, but was based on what he was told by defense counsel. During the hearing, Mr. Crumbaugh also stated that he believed it was possible that David Mauro *was* demon-possessed. At the hearing's conclusion, the trial court denied defendant's motion to vacate judgment.

Before post-conviction relief based on newly discovered evidence shall be granted, the material presented must meet 5 requirements: (1) it must appear from the motion that the evidence relied on is, in fact, newly discovered, i.e., discovered after the trial; (2) the motion must allege facts from which the court can infer due diligence; (3) the evidence relied on must not be merely cumulative or impeaching; (4)

the evidence must be material to the issue involved; and (5) it must be evidence that would probably change the verdict if a new trial were ordered. Rule 32.1(e), Arizona Rules of Criminal Procedure; *State v. Fisher*, 141 Ariz. 227, 251, 686 P.2d 750, 774 (1984). In addition, if the motion relies on the existence of a witness willing to testify and present the new evidence at a new trial, such witness must appear to be credible to the trial judge hearing the motion. *Id.* Absent an abuse of discretion, this court will not disturb the trial court's determination regarding the new evidence. *Id.*

Our review of the record shows that the alleged new evidence fails to meet at least 4 of the 5 requirements mentioned above. The evidence is not new, because the allegations made by Mr. Crumbaugh in his affidavit were either known by the defendant before trial or had already been testified to at trial. Furthermore, all the evidence was impeaching and was for the most part cumulative of other evidence brought out during the trial. Finally, we do not believe the evidence would probably have changed the verdict if a new trial were ordered, because the evidence does not go to the primary issue of the case— the defendant's insanity defense—and Linda Mauro was cross-examined in all the areas referred to in the affidavit. The trial court did not abuse its discretion in denying defendant's motion to vacate judgment.

B. *Death Sentence.* Although the trial court "weighed" the aggravating circumstances against a single mitigating circumstance and concluded that a sentence of death was appropriate, this court has the duty to independently review the existence of aggravating or mitigating circumstances and to determine whether the death penalty was improperly imposed or should be reduced to life imprisonment. *State v. Fulminante*, CR–86–0053–AP (Ariz.1988); *State v. Roscoe*, 145 Ariz. 212, 226, 700 P.2d 1312, 1326 (1984); *State v. Brookover*, 124 Ariz. 38, 42, 601 P.2d 1322, 1326 (1979), quoting *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976).

Following a presentence aggravation-mitigation hearing, the trial court found two of the aggravating factors set out in A.R.S. § 13–703(F): (1) defendant was previously convicted of Felony Menacing in Colorado involving the use or threat of violence on another person; and (2) defendant committed this homicide in an especially heinous, cruel, or depraved manner. The trial court also found one mitigating circumstance pursuant to A.R.S. § 13–703(G)(1)—defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution. However, the trial court did not give this circumstance "full weight" because it held the defendant responsible for not seeking help "when his out of control episodes were about to occur" and for his willful refusal of medication and counseling.

After considering the aggravating and mitigating factors, the trial court concluded as follows:

> [The court] is unable to find any mitigating circumstances which would call for a sentence less than death. The mitigating circumstance of significant impairment is offset by the aggravating circumstance of a dangerous felony conviction. That leaves the other aggravating circumstance of heinous, cruel, and depraved standing alone, and it is a solid and a well-substantiated one.

In analyzing the evidence in this case, we first note that A.R.S. § 13–703 does not require that the number of aggravating circumstances be weighed against the number of mitigating circumstances. *See Brookover*, 124 Ariz. at 42, 601 P.2d at 1326. As pointed out in *Brookover*, "One mitigating circumstance, for example, may be 'sufficiently substantial' to outweigh two aggravating circumstances." *Id.*

The only expert witness to directly address the defendant's capacity in regard to A.R.S. § 13–703(G)(1) was Dr. Gerstenberger. During the aggravation-mitigation hearing, Dr. Gerstenberger testified that the defendant's mental health at the time of the homicide satisfied the criteria of § 13–703(G)(1)—that the defendant could not appreciate the wrongfulness of his act. This testimony was consistent with Dr. Gerstenberger's trial testimony that the defendant was insane under the *M'Naghten* rule at the time of the homicide because he suffered "from a mental disease, in the form of bipolar affective disorder." Dr. Gerstenberger explained that bipolar affective disorder is a chemical disorder in the brain.

The state's psychiatrist, Dr. Cleary, testified at trial that the defendant was not insane under the *M'Naghten* rule and that defendant's conduct was symptomatic of a compulsive personality disorder. Dr. Cleary did not offer an opinion about whether defendant met the criteria of A.R.S. § 13–703(G)(1).

After carefully examining the record, we conclude that defendant's capacity to control his conduct was significantly impaired and is a "sufficiently substantial" mitigating circumstance to outweigh the two aggravating factors found by the trial court. Given the evidence in this case, we find that reduction of the sentence to life imprisonment is required by well established law. *See Brookover*, 124 Ariz. at 42, 601 P.2d at 1326; *State v. Doss*, 116 Ariz. 156, 163, 568 P.2d 1054, 1061 (1977).

We affirm the conviction for first degree murder. However, we modify the sentence, changing it from death to life imprisonment without possibility of parole until the completion of the service of 25 calendar years. Laws 1982, ch. 325, § 5. Amendments to §§ 13–703(A), (E), and (F)(9), which now require imprisonment of 35 years when the victim is under 15 years of age, were not adopted until 1985, and thus do not apply to defendant's 1982 offense. *See* Laws 1985, ch. 364, § 8.

◼ C. *Child Abuse Sentence.* The trial court sentenced defendant to an aggravated term of 28 years for child abuse, a class 2 felony. *See* A.R.S. §§ 13–604(G), (I) and (K); Laws 1982, ch. 322, § 1. The court found as aggravating circumstances that defendant inflicted serious physical injury on the victim, that defendant acted in

an especially heinous or depraved manner, that the victim suffered cruelly, that emotional harm was caused to the victim and other members of the victim's family, and that defendant had been convicted in Colorado in 1980 of the crime of Felony Menacing with the use of an automobile, which would qualify as a dangerous instrument under Arizona law. *See State v. Woodall,* 155 Ariz. 1, 7, 744 P.2d 732, 738 (App.1987).

The trial court again found as a mitigating circumstance that defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution. The trial court found that defendant is so dangerous that he should never be released from prison and, therefore, ordered that the child abuse sentence run *consecutive* to the murder sentence.

Defendant objects to the use of the Colorado conviction. He claims (1) the Colorado felony was not a dangerous offense, (2) that, if it was, its use violated the double jeopardy provisions of the Arizona and United States Constitutions, and (3) the use of the Colorado conviction violated the double punishment statute, A.R.S. § 13–116.

Defendant apparently argues that because the State of Colorado failed to seek enhancement of the offense under Colorado law, any finding of dangerousness by the trial court is barred by the double jeopardy provisions of the Arizona and United States Constitutions, and by A.R.S. § 13–116, which prohibits double punishment for the same offense.

We find no merit in this argument. The finding of the trial court regarding dangerousness was not used to retry defendant or to increase the punishment for his prior Colorado conviction. Therefore, defendant's invocation of the double jeopardy provisions of the state and federal constitutions is misplaced. Nor does A.R.S. § 13–116 support defendant's argument. As we stated in *State v. LeMaster,* 137 Ariz. 159, 166, 669 P.2d 592, 599 (1983):

Double jeopardy or double punishment principles do not preclude the trial court

from using the prior conviction to impose an enhanced sentence under the recidivist statute, A.R.S. § 13–604....

Defendant pleaded guilty to Felony Menacing under Colo.Rev.Stat. § 18–3–206 (1973), which provided that a person would be guilty if "by any threat or physical action, he knowingly places or attempts to place another person in fear of imminent serious bodily injury ... by the use of a deadly weapon." The definitional statute, Colo.Rev.Stat. § 18–1–901(3)(e) (1979), provided that a "deadly weapon" was "any device, [or] instrument ... which in the manner it is used or intended to be used is capable of producing death or serious bodily injury." The count of the information to which defendant pleaded guilty charged that defendant "by threat and physical action and by use of a deadly weapon, to-wit: a motor vehicle, did unlawfully, feloniously and knowingly place and attempt to place Rose Pulos, in fear of imminent serious bodily injury...."

The trial court appropriately found, pursuant to A.R.S. § 13–604(I), Laws 1982, ch. 322, § 1, that the automobile in the Colorado Felony Menacing conviction would qualify as a dangerous instrument under Arizona law. *See* A.R.S. § 13–105(8). The trial court also found that defendant inflicted or threatened infliction of serious physical injury to the victim. A.R.S. § 13–604(G), Laws 1982, ch. 322, § 1.

We affirm the sentence of 28 years of imprisonment for the child abuse conviction, to run consecutively to the murder sentence. We iterate the finding by the trial court: defendant is so dangerous that he should never be released from prison.

We have examined the record for fundamental error, pursuant to A.R.S. § 13–4035; having found none, we affirm the judgment and sentences, as modified.

FELDMAN, V.C.J., and CAMERON, HOLOHAN and MOELLER, JJ., concur.

GORDON, C.J., did not participate in this decision; pursuant to Ariz. Const.

art. 6, § 3, ROBERT J. CORCORAN, Judge, Court of Appeals, Division One, was designated to sit in his stead.